173 F.3d 1158
 99 Cal. Daily Op. Serv. 2432, 1999 Daily
Journal D.A.R. 3174
State of WASHINGTON, Petitioner-Appellant,
v.
William M. DALEY,* United States Secretary
of Commerce, Respondent-Appellee.
Midwater Trawlers Co-Operative; West Coast Seafood
Processors; Fisherman's Marketing Assoc.,
Plaintiffs-Appellants,
v.
Department of Commerce, National Marine Fisheries Service,
William M. Daley,** United
States Secretary of Commerce,
Defendants-Appellees.
 Nos. 97-35680, 97-36008.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 17, 1998.
Decided April 2, 1999.
 
 Fonda Woods and Robert Costello, Assistant Attorneys General, Olympia, Washington, for petitioner-appellant State of Washington v. Daley, No. 97-35680.
 James Johnson, Olympia, Washington, for plaintiffs-appellants Midwater Trawlers Co-Operative v. DOC, No. 97-36008.
 M. Alice Thurston, United States Department of Justice, Washington, D.C., for respondent-appellee in case State of Washington v. Daley, No. 97-35680 and defendants-appellees Midwater Trawlers Co-Operative v. DOC, No. 97-36008.
 Appeals from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief Judge, Presiding. D.C. Nos. CV-96-00561-BJR, CV-96-01808R.
 Before: GOODWIN, SCHROEDER and BEEZER, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 The State of Washington ("Washington") and Midwater Trawlers Cooperative, West Coast Seafood Processors Association and Fisherman's Marketing Association (collectively "Midwater") appeal the district court's dismissals of their petitions seeking to overturn regulations promulgated by the Secretary of Commerce ("the Secretary") allocating groundfish catches off the Washington coast to four Northwest Indian tribes ("the Tribes"). Midwater and Washington also appeal the denial of the motion for reconsideration and motion for consolidation with Subproceeding 96-2 in United States v. Washington, Civil No. 9213. In addition, Midwater appeals the district court's grant of summary judgment in favor of the Secretary on Midwater's claim that the challenged regulations violated the Magnuson Act by failing to comply with the Endangered Species Act and the Regulatory Flexibility Act. We have jurisdiction. 28 U.S.C. § 1291. We affirm in part, reverse in part and remand for further proceedings.
 
 
 2
 * Although these cases were not formally consolidated in the district court, we combine them in this opinion because the cases challenge the same regulation and share common issues. Both cases involve challenges to regulations promulgated by the Secretary acting under the authority of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1882 ("the Magnuson Act"). The Magnuson Act delegates to the Secretary the authority to promulgate regulations governing fisheries within the United States fishery conservation zone, which extends from three to two hundred nautical miles offshore. See 16 U.S.C. § 1811(a); Pres. Proc. No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983) (establishing extent of conservation zone); Teresa M. Cloutier, "Conflicts of Interest on Regional Fishery Management Councils: Corruption or Cooperative Management?," 2 Ocean and Coastal L.J. 101, 116-17 (1996) [hereinafter Cloutier, "Conflicts of Interest"].
 
 
 3
 The Magnuson Act provides for a system of Regional Fishery Management Councils, each of which "prepare[s] and submit[s] to the Secretary of Commerce a fishery management plan (FMP) with respect to each fishery within its geographical area of authority." Cloutier, "Conflicts of Interest," supra, at 117; see also 16 U.S.C. §§ 1852-1861. The Secretary, acting through the National Marine Fisheries Service ("Fisheries Service"), reviews the plans and amendments to the plans for consistency with national standards and "other applicable law." 16 U.S.C. § 1854(a)(1)(A). Assuming that the plan meets these criteria, the Secretary publishes notice of the plan or amendment in the Federal Register and promulgates regulations implementing the plan after the statutory comment period. See Cloutier, "Conflicts of Interest," supra, at 117-18; 16 U.S.C. § 1854(a)-(b). The Secretary may independently prepare a plan only if the Regional Management Council has failed to do so within a reasonable time or if the Secretary disapproves a submitted plan and the submitting council fails to submit a revised version. 16 U.S.C. § 1854(c)(1).
 
 
 4
 The Pacific Fishery Management Council ("the Pacific Council") is authorized to prepare plans for fisheries off the coasts of Washington, Oregon and California. 16 U.S.C. § 1852(a)(1)(F). The Pacific Coast Groundfish Management Plan ("the Plan"), first adopted in 1982, manages whiting fisheries.[1] See 47 Fed.Reg. 6043 (1982); 50 C.F.R. § 660, Subpart G. Since 1989, the Pacific Council has allocated portions of the sablefish and rockfish harvests to the four Tribes that each have a reservation on the Pacific coast of Washington state--the Makah, Hoh and Quileute tribes and the Quinault Indian Nation.
 
 
 5
 In 1995 the Makah tribe petitioned the Pacific Council to set aside a harvest of 25,000 metric tons of whiting. The Makah claimed that their treaty with the United States[2] secures to them the right to harvest whiting within their "usual and accustomed" fishing grounds, which extend roughly westward from the northwest coast of Washington to 125 44 West longitude. See United States v. Washington, 730 F.2d 1314 (9th Cir.1984). In October 1995, the Fisheries Service and the General Counsel to the National Oceanic and Atmospheric Administration advised the Pacific Council that the Tribes have treaty rights to harvest groundfish in their "usual and accustomed" grounds. 61 Fed.Reg. 10303 (1996). In November 1995, after hearing testimony from members of the fishing industry and the Attorney General's office of the State of Oregon, the Pacific Council voted against recognition of the Tribes' treaty rights in the whiting fishery on the ground "that a treaty tribe's right to harvest fish from its [usual and accustomed] area only exists for those species to which the tribe can show historical catch or access at the time the treaty was signed." Id.
 
 
 6
 The Secretary rejected the Pacific Council's recommendations as contrary to "other applicable law"--specifically, the treaties with the Tribes. Id.; see 16 U.S.C. § 1854(a)(1)(A). The Secretary therefore published a proposed amendment to the Plan's implementing regulations to establish a "framework process" to "accommodate treaty rights" in the groundfish fishery. 61 Fed.Reg. at 10304. The Secretary also proposed other modifications to the groundfish regulations and sought public comment on the 1996 allocation of whiting to the Makah. Id.
 
 
 7
 On June 6, 1996, the Secretary published the final rule,[3] which established the framework for implementing the Tribes' treaty rights in the groundfish fishery and allocated 15,000 metric tons of whiting to the Makah. 61 Fed.Reg. 28786 (1996); 50 C.F.R. § 660.324.[4] The final rule provides that, for purposes of the Plan, the "usual and accustomed fishing areas" of the Tribes extend west from Washington's Pacific coast to 1254400 West longitude and from the international boundary with Canada on the north (the most northerly portion of the Makah's treaty area) to 465318 North latitude (the most southerly portion of the Quinaults' treaty area). 50 C.F.R. § 660.324(c). The Secretary noted that federal salmon and halibut regulations had recognized the same areas as "usual and accustomed" tribal fishing grounds. 61 Fed.Reg. at 28789. The Secretary also noted that the western boundary was determined by extending south the line of the Makah's adjudicated western boundary. Id. (citing United States v. Washington, 626 F.Supp. 1405, 1467 (W.D.Wash.1985), aff'd, 730 F.2d 1314 (9th Cir.1984)).
 
 The final rule also states that
 
 8
 [t]he Secretary recognizes the sovereign status and co-manager role of Indian tribes over shared Federal and tribal fishery resources. Accordingly, the Secretary will develop tribal allocations and regulations under this paragraph in consultation with the affected tribe(s) and, insofar as possible, with tribal consensus.
 
 
 9
 50 C.F.R. § 660.324(d). This language was added to the rule in response to a comment by the Quileute Tribe. 61 Fed.Reg. at 28791.
 
 
 10
 On April 19, 1996, the Makah instituted Subproceeding 96-2 in United States v. Washington in the Western District of Washington. The Makah sought a determination from the district court that they had a treaty right to take whiting and that their participation in the fishery would not violate Paragraph G of the district court's 1975 order. See United States v. Washington, 459 F.Supp. 1020, 1037-38 (W.D.Wash.1978).[5] On November 4, 1996, the district court entered an order granting partial summary judgment in favor of the Makah. The court held that the Secretary had not violated Paragraph G by promulgating the regulation at issue here; that Paragraph G did not require "a preliminary determination of Makahs' treaty right entitlement to fish for Pacific whiting and rockfish in its usual and accustomed fishing grounds in light of Judge Rafeedie's ruling in Subproceeding 89-3, which constitutes the law of the case"; and that Washington and Oregon had failed to produce evidence sufficient to withstand summary judgment on their claim that the Makah did not have treaty rights to whiting.
 
 
 11
 On June 26, 1996, Midwater filed a complaint in the district court for the District of Oregon. Midwater sought a declaration that the regulation was adopted in violation of the Magnuson Act, the Administrative Procedures Act, 5 U.S.C. § 706, and the Fifth Amendment. As part of the Magnuson Act claim, Midwater sought a declaration that the Secretary had failed to comply with the Endangered Species Act, 16 U.S.C. § 1531, the National Environmental Policy Act, 42 U.S.C. § 4321, and the Regulatory Flexibility Act, 5 U.S.C. § 601. Midwater sought a declaration that the Secretary had violated the Freedom of Information Act, 5 U.S.C. § 552. Midwater requested that the Secretary be enjoined from enforcing the challenged regulation, from promulgating other similar regulations, from authorizing fisheries that would have a detrimental effect on species protected under the Endangered Species Act and from withholding records requested under the Freedom of Information Act. The Oregon district court granted the Secretary's motion to transfer the case to the Western District of Washington.
 
 
 12
 The Secretary then moved for dismissal, pursuant to Rule 19 of the Federal Rules of Civil Procedure, on the ground that Midwater had failed to join, and could not join, the Tribes. The district court granted the motion, dismissing all of Midwater's claims related to the Tribes' treaty rights. Midwater moved for reconsideration of the order of dismissal or for an order consolidating its case with United States v. Washington, in Subproceeding 96-2. The court denied both motions. The court later granted summary judgment in favor of the Secretary on Midwater's claims alleging violations of the Regulatory Flexibility Act and the Endangered Species Act. This timely appeal followed.
 
 
 13
 Washington filed its petition in the District Court for the Western District of Washington on July 3, 1996, seeking to have the challenged regulation set aside and held unlawful. The court granted the Secretary's motion for dismissal pursuant to Rule 19. Subsequently the district court denied Washington's motions for reconsideration and consolidation with United States v. Washington. This timely appeal followed.
 
 II
 
 14
 We now address the jurisdictional question of mootness. If a case is moot, we lack jurisdiction over the appeal. See Kescoli v. Babbitt, 101 F.3d 1304, 1308 (9th Cir.1996). We conclude that these cases are not moot.
 
 
 15
 * We reject the Makah and Tulalip tribes' contention that these cases are moot with regard to appellants' Magnuson Act claims.[6] The Makah and Tulalip contend that, because the 1996 and 1997 fishing seasons are now past, the challenges to the regulations are moot. This argument is persuasive only to the extent that Midwater and Washington challenge the allocations to the Tribes in 1996 and 1997. But Midwater and Washington both argue principally that the Secretary acted arbitrarily and capriciously in promulgating the "framework regulation." Specifically, Midwater and Washington argue that those portions of the regulation defining the usual and accustomed fishing grounds of the Tribes, recognizing shared management responsibilities among the Tribes and the federal government and recognizing the Tribes' treaty rights to whiting were arbitrarily and capriciously decided. Because the framework regulation is still effective, the challenges to it are not moot. See Kescoli, 101 F.3d at 1309 (determining case is not moot where condition governing operations remains in effect).
 
 
 16
 The Makah and Tulalip incorrectly argue that the reduction in non-treaty whiting allocation as a result of allocations to the Tribes is neither fairly traceable to the framework regulation nor likely to be redressed by a decision invalidating that regulation. The "irreducible constitutional minimum of standing" requires: (1) that the plaintiff have suffered an actual injury that is (2) fairly traceable to the defendants' action and (3) that would likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because allocations have been and will continue to be made on the basis of the challenged regulation, appellants' injury is fairly traceable to that regulation. See id. at 560, 112 S.Ct. 2130. The injury would likely be redressed by a favorable decision in this case. See id. at 561, 112 S.Ct. 2130. A judicial determination that the Tribes do not have treaty rights in the disputed area would effectively transfer the tribal allocation to the nontribal portion of the fishery. The cases remain live because the injury suffered by appellants would be redressed by a favorable decision here. See id.
 
 B
 
 17
 The Makah and Tulalip insist that appellants' petitions are moot because the underlying factual predicate no longer exists. There has been a judicial determination in Subproceeding 96-2 that the Makah have a treaty right to take whiting. In addition, in 1998 the Pacific Council recommended an allocation of 25,000 metric tons of whiting to the treaty fisheries, thus acquiescing in the Secretary's approach. Moreover, in the shellfish subproceeding we held that the Tribes have a treaty right to take all species of fish in their usual and accustomed grounds. See United States v. Washington, 157 F.3d 630, 644 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3437 (U.S. Dec. 22, 1998) (No. 98-1028).
 
 
 18
 While the factual basis for the challenges to the regulation has changed since the institution of these proceedings, the cases are not moot. First, the challenged regulation remains effective.[7] Second, the district court's decision in Subproceeding 96-2 did not determine the treaty rights of the Hoh, Quileute or Quinault, nor did it determine the extent of the usual and accustomed grounds of those tribes. Third, the Pacific Council's recommended allocation does not insulate the regulation from review--if the regulation was arbitrary and capricious when promulgated, it still remains arbitrary and capricious. These cases are not moot.
 
 III
 
 19
 Midwater and Washington argue that the district court erred in dismissing their petitions, pursuant to Federal Rule of Civil Procedure 19 ("Rule 19"), for failure to join the Tribes as necessary and indispensable parties. A determination concerning joinder is "a practical one and fact specific." Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.1990). We review dismissals pursuant to Rule 19 for an abuse of discretion. See Kescoli, 101 F.3d at 1309. We review the district court's legal determinations de novo. See id.
 
 
 20
 * We reject appellants' arguments that challenges brought pursuant to the Magnuson Act, 16 U.S.C. § 1855(f), are always reviewable, including all cases where tribes are absent parties. In essence, appellants insist that Rule 19 does not apply to cases challenging regulations promulgated pursuant to the Magnuson Act.
 
 
 21
 The Magnuson Act provides in relevant part:
 
 
 22
 (1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable, except that--
 
 
 23
 (A) section 705 of such Title is not applicable, and
 
 
 24
 (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.
 
 
 25
 (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.
 
 
 26
 16 U.S.C. § 1855(f)(1)-(2). Section 1855(f) of the Magnuson Act refers to § 706 of the Administrative Procedures Act, 5 U.S.C. § 706, which provides in part:
 
 
 27
 [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
 
 
 28
 ....
 
 
 29
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 30
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 31
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 32
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
 
 
 33
 (D) without observance of procedure required by law;
 
 
 34
 ....
 
 
 35
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 36
 5 U.S.C. § 706.
 
 
 37
 Appellants' characterization of the scope of review of regulations in cases where the tribes are absent parties is unpersuasive in light of our opinion in Makah Indian Tribe v. Verity, 910 F.2d 555 (9th Cir.1990).[8] In Verity, the Makah challenged federal regulations promulgated pursuant to the Magnuson Act allocating the ocean harvest of migrating Columbia River salmon. We considered whether the Makah's challenge was subject to dismissal pursuant to Rule 19 for failure to join other tribes. See Verity, 910 F.2d at 558-60. We follow our decision in Verity and proceed to consider whether Rule 19 mandates the dismissal of these actions.[9]B
 
 
 38
 We apply a two-part analysis to a dismissal pursuant to Rule 19. See Kescoli, 101 F.3d at 1309. First, we determine whether an absent party is "necessary." Id.; see also Fed.R.Civ.P. 19(a). If the absent party is necessary and cannot be joined, we then decide whether the absent party is "indispensable." Id. (citing Verity, 910 F.2d at 558).
 
 
 39
 Under Rule 19(a)(2), an absent party is necessary if
 
 
 40
 the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
 
 
 41
 Fed.R.Civ.P. 19(a)(2). The district court correctly concluded that the Tribes have an interest in the subject of the actions. As the district court noted, appellants seek to invalidate the federal rule recognizing Pacific Coast Tribes' treaty rights to harvest groundfish. If appellants are ultimately successful, the Tribes will lose their rights to harvest whiting specifically and groundfish generally. Having concluded that the Tribes have an interest in these actions, we now consider whether the Tribes are necessary parties within the meaning of Rule 19.[10]
 
 
 42
 We agree with appellants that the Tribes are not necessary parties because the United States can adequately represent the Tribes in this matter. As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit. See Southwest Center for Biological Diversity v. Babbitt, 150 F.3d 1152, 1153 (9th Cir.1998); see also Verity, 910 F.2d at 558. In determining whether an absent party is adequately represented by an existing party, we consider
 
 
 43
 whether "the interests of a present party to the suit are such that it will undoubtedly make all" of the absent party's arguments; whether the party is "capable of and willing to make such arguments"; and whether the absent party would "offer any necessary element to the proceedings" that the present parties would neglect.
 
 
 44
 Shermoen, 982 F.2d at 1318 (quoting County of Fresno v. Andrus, 622 F.2d 436, 439 (9th Cir.1980)).
 
 
 45
 We conclude that the Tribes are not necessary parties because their interests can be adequately represented by the federal defendants. "The United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe." Southwest Center, 150 F.3d at 1154 (citing Shermoen, 982 F.2d at 1318; Verity, 910 F.2d at 558).
 
 
 46
 There is no conflict of interest between the federal defendants and the Tribes in the instant matter.[11] In fact, the Secretary and the Tribes have virtually identical interests in this regard. Cf. Southwest Center, 150 F.3d at 1154 (United States may represent absent Indian community where government and community share "strong interest in defeating" an action). The government and the Tribes do not disagree on the issues at hand: the Secretary and the Tribes agree that the Tribes have a treaty right to whiting within the area defined by the regulation and that the Tribes are co-managers with the federal government of the resources within those regions. Furthermore, the federal government, including the Secretary, has a trust responsibility to the Tribes. See Parravano v. Babbitt, 70 F.3d 539, 546 (9th Cir.1995) ("We have noted, with great frequency, that the federal government is the trustee of the Indian tribes' rights, including fishing rights."). This responsibility obligates the Secretary to protect the Tribes' interests in this matter.
 
 
 47
 Finally, there is no clear potential for inconsistency between the Secretary's obligations to the Tribes and its obligations to protect the fishery resource. A conflict would arise only in regard to the level of allocations, which are not at issue here. The Secretary and the amici Tribes have failed to demonstrate how such a conflict might actually arise in the context of this case. See Southwest Center, 150 F.3d at 1154 (rejecting possibility of conflict arising from government's "potentially inconsistent responsibilities" where parties failed to demonstrate "how such a conflict might actually arise in the context of [the action at hand]").
 
 
 48
 Our opinion in Verity does not compel a determination that the Tribes are necessary parties here. In that case, the Makah challenged both the ocean quotas and the regulatory process by which the quotas were established. 910 F.2d at 556-57. The district court decided that the Makah sought reallocation of the ocean harvest of the salmon and that, in the absence of other affected tribes, the district court could not grant the relief sought by the Makah. Id. at 557. We held that the absent tribes were necessary parties to the extent that the Makah sought a reallocation of the 1987 harvest or challenged the intertribal allocation decisions of the Secretary of Commerce. Id. at 559. We agreed with the district court that the absent tribes had an interest in the suit because "any share that goes to the Makah must come from [the] other tribes." Id.
 
 
 49
 Our decision in Verity that the absent tribes were necessary to the adjudication of the reallocation of the 1987 harvest was premised on the conclusion that "the federal government could not protect the interests of the absent tribes because those interests conflict[ed] among themselves." Id. The existence of demonstrable conflict between the Makah and the absent tribe was of paramount concern in this portion of our decision in Verity.
 
 
 50
 We also decided in Verity that the absent tribes were not necessary to the Makah's procedural claims[12] for which they sought prospective injunctive relief. Id. at 559. We explained, "The absent tribes would not be prejudiced because all of the tribes have an equal interest in an administrative process that is lawful." Id. at 559. Where the tribes' shared interests were compatible, we concluded that the absent tribes were not necessary parties under Rule 19 and we allowed the Makah's claim for injunctive relief to proceed in the absence of the other tribes.
 
 
 51
 The Tribes are not necessary parties because there is no direct conflict between the federal defendants and the Tribes, or between the Tribes themselves in the instant matter. Consequently, the federal defendants can adequately represent the Tribes' interests in these proceedings for the purposes of Rule 19. Because we conclude that the Tribes are not necessary parties, we need not consider whether they are indispensable parties under Rule 19(b). See Yellowstone County v. Pease, 96 F.3d 1169, 1172 (9th Cir.1996) (declining to advance to Rule 19(b) analysis upon concluding that absent Tribe is not a necessary party under Rule 19(a)), cert. denied, 520 U.S. 1209, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997); see also Southwest Center, 150 F.3d at 1155 (reversing district court's determination that absent party was "necessary" and remanding without Rule 19(b) analysis). We reverse the district court's dismissal of these actions for failure to join the tribes.[13]
 
 IV
 
 52
 Midwater[14] appeals the grant of summary judgment on its Endangered Species Act and Regulatory Flexibility Act claims.[15] We hold that the district court correctly granted summary judgment on these claims.
 
 
 53
 When reviewing regulations promulgated by the Secretary of Commerce and challenged under the Magnuson Act, our "only function is to determine whether the Secretary 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " Alliance Against IFQs v. Brown, 84 F.3d 343, 345 (9th Cir.1996), cert. denied, 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997) (quoting Washington Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir.1990)). "We determine only if the Secretary acted in an arbitrary and capricious manner in promulgating such regulations." Id. The arbitrary and capricious standard is narrow, and we may not substitute our judgment for that of the agency. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). We must decide whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Id.
 
 
 54
 * The Endangered Species Act requires federal agencies to "insure that any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species...." 16 U.S.C. § 1536(a)(2). The National Marine Fisheries Service ("Fisheries Service") has listed Snake River fall chinook as a threatened species. See 57 Fed.Reg. 14653 (1992).
 
 
 55
 If the actions of a federal agency may affect a listed species, then the agency must consult with the Secretary of the Interior or a delegated agent. See 16 U.S.C. § 1536(a)(4); 50 C.F.R. §§ 402.14(a) and 402.01(b) (delegating salmon protection to the Fisheries Service). The agency prepares a biological opinion, evaluating the effects of the agency action on the listed species. See 50 C.F.R. 402.14(g). If the biological opinion provides that the agency action has adverse effects on the listed species, then further consultation and, if necessary, ameliorative action is required. See id.
 
 
 56
 In 1992, the Fisheries Service found that the Plan had no adverse effect on Snake River fall chinook. In 1993, the Fisheries Service found that the actual ratio of chinook salmon bycatch to whiting was less than 0.05 salmon/metric ton of whiting. The parties do not dispute that the Makah's actual bycatch exceeded the expected 0.05 ratio. In 1996, the Fisheries Service re-initiated consultation and concluded that the Plan continued to have an effect on chinook "within the range anticipated during the original analysis." Based on this data, the Department of Commerce concluded that the plan did not violate the Endangered Species Act. The district court determined that Midwater had not met its burden of showing that the Plan was arbitrary and capricious and granted summary judgment.
 
 
 57
 Midwater argues that the Department of Commerce violated the Endangered Species Act because of the tribal whiting fishery's potential effect on Snake River fall chinook salmon. Midwater asserts that the Department of Commerce did not re-initiate consultation after evidence showed that the Makah fishery exceeded the expected bycatch of the endangered species.[16]
 
 
 58
 Midwater claims that the Department of Commerce violated the Endangered Species Act when it failed to analyze whether the regulation causes a shift of harvest to fisheries in the North, where the waters have "higher relative concentrations of fish species endangered or in need of protection." Midwater argues that the impact on northern chinook salmon exceeded that expected in the 1992 and 1993 biological opinions, and requires re-initiation of consultation under the Endangered Species Act. The Fisheries Service re-initiated consultation in 1996 and concluded that although the bycatch exceeded the predicted amount it did not jeopardize the species. The Fisheries Service reasoned that the increased bycatch would not jeopardize chinook salmon because (1) the overall amount of the species had increased, (2) the change was proportional and (3) the overall take was within the originally expected range.
 
 
 59
 Because the agency followed the required steps and its conclusions were not arbitrary and capricious, we conclude that the Department of Commerce did not violate the Endangered Species Act.
 
 B
 
 60
 The Regulatory Flexibility Act provides that an agency shall accompany the promulgation of a new rule with a "final regulatory flexibility analysis" assessing the negative impact of the rule on small businesses. 5 U.S.C. § 604. Final regulatory flexibility analysis is required for any rule that will have a "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). In the analysis, the agency must evaluate how the rule will affect small businesses, describe the steps the agency has taken to "minimize the significant economic impact" of the rule on small entities and explain "why each one of the other significant alternatives to the rule" was rejected. 5 U.S.C. § 604(a)(5). The agency need not engage in a flexibility analysis if the head of the agency certifies that the proposed agency action will not have a significant economic impact on a substantial number of small entities. See 5 U.S.C. § 605(b). The parties agree that the economic impact would be considered significant if the action resulted in more than a 5% reduction in annual gross revenues.
 
 
 61
 The district court granted summary judgment for the Department of Commerce finding that the agency action "will not have a significant economic impact on a substantial number of small entities." The district court noted that the "Secretary concluded that the 7% tribal allocation of whiting would result in a 1-3% reduction in annual gross revenue" for Midwater.
 
 
 62
 Midwater argues that the Secretary and the district court erred in considering the overall effect on its revenues, rather than the effect on revenue earned from the sale of whiting. The plain language of the statute defeats Midwater's argument: the statute states that Regulatory Flexibility Act analysis is required only if there is a "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). This language calls for the agency to consider the effect on the entity, not the effect on revenue earned from a particular harvest. We affirm the district court's denial of Midwater's Regulatory Flexibility Act claim.
 
 V
 
 63
 In State of Washington v. Daley, No. 97-35680, we conclude that the petition is not moot because the challenged regulations remain effective. We hold that Rule 19 applies to the petition and we reverse the district court's dismissal of the petition because the absent Tribes are not necessary parties. This cause is
 
 
 64
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 65
 In Midwater Trawlers Coop. v. Department of Commerce, No. 97-36008, we conclude that the case is not moot because the challenged regulations remain effective. We hold that Rule 19 applies to the petition and that the absent Tribes are not necessary parties. We reverse the dismissal of the petition. In addition, we affirm summary judgment on appellants' Endangered Species Act and Regulatory Flexibility Act claims. This cause is
 
 
 66
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 *
 William M. Daley is substituted for his predecessor, Mickey Kantor, United States Secretary of Commerce, pursuant to Fed. R.App. P. 43(c)
 
 
 **
 William M. Daley is substituted for his predecessor, Mickey Kantor, United States Secretary of Commerce, pursuant to Fed. R.App. P. 43(c)
 
 
 [1]
 Pacific whiting, also known as Pacific hake and found off the west coast of North America, is used to make seafood products such as imitation crab. Whiting, sablefish and rockfish are among more than 80 species of groundfish whose allocation is governed by the Plan. 50 C.F.R. § 660.302
 
 
 [2]
 Treaty of Neah Bay, 12 Stat. 939 (Jan. 31, 1855). Article 4 of that treaty provides that "[t]he right to taking fish ... at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States...." The Treaty with the Makah is one of the Stevens Treaties. See generally United States v. Washington, 157 F.3d 630 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3437 (U.S. Dec. 28, 1998) (No. 98-1028)
 The Quileute, Hoh and Quinault are parties to the Treaty of Olympia, 12 Stat. 971 (July 1, 1855), which contains language similar to that in the Treaty of Neah Bay.
 
 
 [3]
 The Secretary received 17 comments to the final rule, many of which raised the same objections as are raised on the merits in the petitions at issue here. See 61 Fed.Reg. 28786, 28788-94 (1996)
 
 
 [4]
 The rule was initially numbered 50 C.F.R. § 663.24. It was renumbered on July 1, 1996. 61 Fed.Reg. 34570 (1996)
 
 
 [5]
 In pertinent part, Paragraph G provides as follows:
 In order to be entitled to exercise off-reservation treaty fishing rights to nonanadromous fish and shellfish, any tribe party to this case shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty entitlements to such nonanadromous fish and shellfish upon which the court may make a preliminary determination as to the tribe's entitlement to such species, pending final determination of tribal treaty-right entitlement to nonanadromous fish and shellfish....
 Washington, 459 F.Supp. at 1037.
 
 
 [6]
 Although this argument is raised only in Midwater Trawlers Coop. v. Department of Commerce, No. 97-36008, our analysis applies to State of Washington v. Daley, 97-35680. See North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (federal courts may address issues of mootness sua sponte)
 
 
 [7]
 This is in contrast with the circumstances in Shoshone-Bannock Tribes v. Fish & Game Comm'n., 42 F.3d 1278 (9th Cir.1994), where we held that a challenge to an Idaho state fishing regulation was moot where a subsequent event "ha[d] so changed the legal dynamics of the interaction among the Tribes, the federal government and the state that it [was] highly unlikely that the same or a similar action by the state [would] occur in the future in anything like the manner in which it occurred in 1991." 42 F.3d at 1283
 
 
 [8]
 Washington cites to a number of decisions in which Magnuson Act regulations were reviewed under the Administrative Procedure Act, despite the absence of particular tribes. See, e.g., Alliance Against IFQs v. Brown, 84 F.3d 343, 344 (9th Cir.1996), cert. denied, 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997) (upholding regulations for implementing fishery management plan in and near Alaska waters); Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1459-60 (9th Cir.1987) (upholding amendment to Alaska Groundfish Management Plan and implementing regulations); Washington State Charterboat Ass'n v. Baldrige, 702 F.2d 820 (9th Cir.1983) (upholding "run-by-run approach" in federal management plan for allocating salmon off coast of Washington). None of these cases addressed the applicability of Rule 19. They do not constitute binding precedent
 
 
 [9]
 We follow Verity 's application of Rule 19 to consider whether the Tribes' absence as parties mandates the dismissal of appellants' challenges to regulations promulgated under the Magnuson Act. For the reasons explained in Section II B, the facts of these cases differ from the circumstances presented in Verity; application of Rule 19 in these cases thus yields a different conclusion
 
 
 [10]
 Midwater argues that the Tribes cannot be described as necessary parties on the theory that they do not have any established treaty fishing rights to whiting. Whether the Tribes have treaty fishing rights to whiting is the central dispute in these cases. We decline Midwater's invitation to resolve the ultimate issue of the Tribes' treaty rights at this stage of the proceedings. Under Rule 19, "the finding that a party is necessary to the action is predicated only on that party having a claim to an interest." Shermoen v. United States, 982 F.2d 1312, 1317 (9th Cir.1992) (emphasis in original). In Shermoen, we suggested that "patently frivolous claims" may not justify a conclusion that a party is necessary, id. at 1318, but appellants have not suggested that the Tribes' claims are patently frivolous. Because the Tribes have a nonfrivolous claim to an interest in this case, they are potentially necessary parties under Rule 19
 
 
 [11]
 We agree with the district court that the Tribes are better prepared than the federal defendants to present anthropological and archaeological evidence about their treaty-time fishing harvests. We are persuaded, however, that this concern is outweighed by the absence of any direct conflict of interest between the United States and the Tribes in this matter
 
 
 [12]
 Washington contends that its petition, like the challenge in Verity, constitutes a purely procedural challenge that would not affect any tribe's ability to prove, either in court or in an administrative proceeding, where it customarily fished at treaty-time. See Verity, 910 F.2d at 559 (holding absent tribes not necessary parties where the relief sought "would affect only the future conduct of [an] administrative agency"). Washington is incorrect. The challenges here are primarily substantive, not procedural. Both appellants seek to have a particular regulation overturned; they do not seek merely prospective injunctive relief requiring the Secretary to follow a particular process in the future. On the merits, this case rests on the issue of whether or not the Tribes have treaty rights within the disputed area. If they do, then the Secretary did not act arbitrarily or capriciously in promulgating the challenged regulation; if they do not, then the Secretary did act arbitrarily and capriciously
 
 
 [13]
 Appellants assert that the district court erred in denying their motions for reconsideration or clarification of the order of dismissal and for consolidation of these cases with Subproceeding 96-2 in United States v. Washington. Appellants have abandoned these issues on appeal by failing to support their assertions with reasoned argument. See Martinez-Serrano v. I.N.S., 94 F.3d 1256, 1259-60 (9th Cir.1996), cert. denied, --- U.S. ----, 118 S.Ct. 49, 139 L.Ed.2d 15 (1997) (issues not supported by argument are deemed abandoned). We would affirm the district court's denial of both motions in any event. Because the district court's original order was not clearly erroneous, the court did not abuse its discretion in denying the motion for reconsideration. See School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir.1993) ("our review of a denial of a motion to reconsider is for an abuse of discretion"). The district court also did not abuse its discretion in denying the motion for consolidation. See In re Adams Apple, Inc., 829 F.2d 1484, 1487 (9th Cir.1987) ("consolidation is within the broad discretion of the district court"). Consolidation would not have eliminated the Tribes' sovereign immunity and thus would not have cured the defects that caused the district court to dismiss the petitions in the first instance
 
 
 [14]
 The Endangered Species Act and Regulatory Flexibility Act claims were pled only in Midwater Trawlers Coop. v. Department of Commerce, No. 97-36008
 
 
 [15]
 Midwater also appears to assert a claim under the National Environmental Policy Act. However, Midwater's references to this Act are made without citation to statute or case law and without analysis. We dismiss Midwater's appeal on this issue for failure to raise the issue adequately. See Martinez-Serrano, 94 F.3d at 1259-60
 
 
 [16]
 The Department of Commerce argues that Midwater's claim should be dismissed for failure to provide notice under the Endangered Species Act's citizen suit provision. See 16 U.S.C. § 1540(g)(2)(A)(i). Because Midwater's claims were brought under the Magnuson Act, the Endangered Species Act's notice requirement need not be met